```
          IN THE UNITED STATES DISTRICT COURT FOR THE

                       DISTRICT OF NEBRASKA

JANELL M. LOBERG and RUSS      )
LOBERG,                        )
                               )
          Plaintiffs,          )        8:09CV280
                               )
     v.                        )
                               )
CIGNA GROUP INSURANCE and      )        MEMORANDUM OPINION
LIFE INSURANCE COMPANY OF      )
North AMERICA,                 )
                               )
          Defendants.          )
_____)
```

This matter is before the Court on the parties' cross-motions for summary judgment (Filing Nos. 35 and 38). Plaintiffs Janell and Russ Loberg (the "Lobergs") brought this action after defendants CIGNA Group Insurance and Life Insurance Company of North America (collectively, "LINA") denied a claim for accidental death benefits following the death of the Lobergs' son, Wade Loberg. The case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1500. After reviewing the briefs, evidentiary record, and applicable law, the Court finds that the Lobergs' motion should be granted, and LINA's motion will be denied.

I.   **Background and Procedural History**.

     **A.  The Accidental Death Policy**. At the time relevant to the events cited herein, Janell Loberg was an employee of Valmont Industries, Inc. (or one of its related affiliates) ("Valmont"). As a Valmont employee, Janell was eligible to

participate in the Group Accident Policy OK 807266 (the "Policy") between Valmont and LINA (Filing No. 18, at 59-106). Under the Policy, coverage was available for Janell's spouse and eligible dependents. Wade was a dependant of Janell under the Policy. The Policy provided in pertinent part:

> [LINA] agree[s] to pay benefits for loss from bodily injuries:
>
>> a) caused by an accident which happens while an insured is covered by this policy; and
>>
>> b) which, directly and from no other causes, resulted in a covered loss. (See the Description of Coverage.)
>
> [LINA] will not pay benefits if the loss was caused by:
>
>> a) sickness, disease, or bodily infirmity; or
>>
>> b) any of the Exclusions listed in the policy.

(Filing No. 18 at 79). The Policy did not define the meaning of the term "accident" (*See* Filing No. 18 at 81).

### B. Wade Loberg.

The Lobergs submitted to LINA several affidavits of Wade's friends, describing Wade and providing details of the night before he died (Filing No. 53, at 13-44). Wade's friends described him as follows:

> Wade was a happy guy.  He would never do anything intentional to take his own life.  He was the type of guy who would say what he thought and who spoke his feelings out loud.  That's how I know he was never sad or down, because if he were I would have known.

(Filing No. 53, at 25).

> Wade was a fun and outgoing guy. He was a good friend of mine and the type of guy that would never harm a fly.  Everyone loved Wade because he had such a charming personality.  He had no enemies.
>
> Wade would never think of harming himself. I believe the whole community of Wisner, Nebraska would attest to that fact.

(Filing No. 53, at 28).

> Wade was always a happy guy.  He was a hard guy to get mad.  He would never have taken any actions to harm himself intentionally.
>
> I have known Wade to drive home after drinking in the past on a few different occasions and he made it home fine.
>
> Wade was not a reckless driver. He was just normal.

(Filing No. 53, at 35).

   Wade died during his first year of college; he had graduated from Wisner High School the previous May.  Wade was attending college in Norfolk, Nebraska, for heating, ventilation,

and air conditioning.  Wade planned to work with his father in his electrician business when he got out of college.

Wade usually drank beer rather than hard alcohol and would drink approximately twelve cans of beer during a typical weekend night out.  Wade had driven home after drinking in the past on more than one occasion and had made it home without incident.  Wade would give his keys away if he thought he had had too much to drink.

On the evening prior to the accident, Wade drank beer in a pickup truck with his friends Derrick Marx, Jordan Lierman, Tanner Marx, and Dexter Lueschen, on a drive from rural Wisner, Nebraska, to Norfolk, Nebraska, to look at a car.  Derrick Marx was driving the pickup; Wade did not drive until he headed home for the night.

On the way to Norfolk, The group drank between 12 - 24 cans of beer, no more than a case.  After not finding the car, the group went to Riley's, in Wayne, Nebraska, on their way home.  Riley's is a place where college students hang out, drink beer, and dance.

After Riley's, the group went back to Derrick's place.  At that point, Tanner Marx needed someone to drive his pickup into town for a tire alignment scheduled at First Class Glass and Alignment in Wisner for the next day.  Wade volunteered to drive Tanner's pickup to town, and Tanner did not think anything of it

because Wade seemed fine to drive.  Tanner trusted Wade with the pickup and did not think there was a danger that he would get in a wreck.  Tanner specifically asked Wade if he was okay to drive, and Wade said he was fine.  Derrick also thought that Wade did not seem like he had had too much to drink and that Wade seemed fine to drive to town.

Dexter Lueshen left before Wade did to go to First Class Glass so that Dexter could give Wade a ride back home. Dexter did not remember anything out of the ordinary with Wade at the time; Wade did not have slurred speech, did not have trouble walking or talking, and he seemed fine to drive to town.  Wade did not appear at First Class Glass and Alignment.  Dexter called Wade once, and when Wade did not answer, Dexter went home.

**C.  Wade's Accident**.  Early in the morning of September 4, 2008, Wade was driving Tanner's pickup southbound on a county road near Wisner when the vehicle violently crashed, killing Wade.  According to the police report, Wade's vehicle crossed the center line, entered the east roadside ditch, overcorrected, and entered the west roadside ditch sideways (Filing No. 18, at 10). The vehicle began rolling, and Wade was ejected from the passenger compartment (*Id.*).  The vehicle rolled over Wade before coming to rest upside down (*Id.*).  Wade was pronounced dead at the crash scene (*Id.* at 13).  Wade was the vehicle's only occupant, and no one else witnessed the crash.

On September 5, 2008, an autopsy of Wade's body was conducted at the Douglas County morgue (*Id.* at 15-21). The autopsy report identified the cause of Wade's death as "blunt trauma to the head, chest and abdomen, with multiple injuries" (*Id.* at 16). A forensic toxicology analysis was also performed, which disclosed that Wade's blood alcohol concentration ("BAC") was 0.172 g/100mL, or 0.172% (*Id.* at 14, 22). On September 22, 2008, the State of Nebraska issued Wade's death certificate, stating that Wade's immediate cause of death was "Blunt trauma to the head, chest and abdomen" due to an "Automobile Accident" (*Id.* at 58).

**D. The 2008 Denial Letter**. The Lobergs submitted a claim for accidental death benefits under the Policy to LINA on October 3, 2008 (*Id.* at 53-55). After reviewing the claim, LINA denied payment of benefits in a letter dated December 5, 2008 (the "2008 Denial Letter") (*Id.* at 3-6). In the 2008 Denial Letter, LINA stated that LINA's Accident Specialist reviewed the following documents in making his determination: (1) the Lobergs' Proof of Loss Claim Form for Accidental Death benefits; (2) Wade's State of Nebraska Certificate of Death; (3) the State of Nebraska Investigator's Motor Vehicle Accident Report; (4) the Report of Alcohol and Drug Analysis for Nebraska Traffic Crashes; and (5) the Policy (*Id.* at 4). LINA specifically noted that

"analysis of Wade Loberg's blood resultd [sic] in a blood alcohol level of .172%" (*Id.* at 4). In summary, LINA stated:

> [The Policy] only pays benefits for loss that was caused by an accident. The Report of Alcohol and Drug Analysis for Nebraska Traffic Crashes documents that Wade Loberg was operating his vehicle with a blood alcohol level of 0.172%. Please note that the legal blood alcohol limit in the State of Nebraska is 0.08%.
>
> Mrs. Loberg, every state in the nation has criminalized drunk driving and has determined, through the imposition of criminal punishment for the offense, that the conduct must be deterred. The legislative purpose of drunken driving laws is to protect the public and guard against the threat of injury. All licensed motorists throughout the United States are on notice, by operation of law, of the state-declared prohibitions against drunk driving and its consequences.
>
> Therefore, as Wade Loberg would have been aware of the risks involved in operating his vehicle while under the influence, his death was not an Accident according to the terms of the Policy. Therefore, no Accidental Death Benefits are payable under [the Policy].

(*Id.*).

**E.   The Lobergs File a Complaint**. On July 10, 2009, the Lobergs filed a complaint in the District Court of Cuming County, Nebraska (Filing No. 1). On August 18, 2009, LINA

-7-

removed the case to the United States District Court for the District of Nebraska (*Id.*).  As this Court has already determined, the Lobergs' state law claims are preempted by federal law (ERISA), and, via the removal process, the Lobergs' preempted state law claims were converted into a federal claim under 29 U.S.C. § 1132(a)(1)(B).  Under ERISA, a plan participant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ."  29 U.S.C. § 1132(a)(1)(B).

The parties filed motions for summary judgment on September 24, 2010 (Filing No. 35), and September 27, 2010 (Filing No. 38).  Subsequently, the Court returned the claim to LINA for evaluation under the standard set out by *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990) as to whether or not Wade's death was an accident under the terms of the Policy (Filing No. 46).

**F.  The 2011 Denial Letter**.  Upon reconsideration under the *Wickman* standard, in a letter dated June 29, 2011 (the "2011 Denial Letter"), LINA concluded that "this insurance benefit is not payable" (Filing No. 53, at 3).  In drawing this conclusion, LINA relied on the report of independent forensic toxicologist Dr. Frederick Fochtman.  Dr. Fochtman stated,

> [Wade] exhibited a learned
> tolerance to alcohol that develops

-8-

> with regular heavy consumption. It is not unusual for an individual with a learned tolerance to "appear" to be okay to drive. However, at a BAC of 0.08% or greater that person's reaction time, judgment, and visual acuity will still be impaired.
>
> Alcohol is a central nervous system depressant causing varying degrees of impairment as the concentration increases in blood (BAC). A BAC of 0.172% will cause an individual to have sensory-motor impairment with decreased levels of attention, judgment and control. Their impairment includes reduced visual acuity, reduced peripheral vision, increased reaction time, and increased risk taking. [Wade] might not have exhibited outward signs to his friends of being under the influence, but he would have been significantly impaired by alcohol.
>
> At a BAC of 0.172% [Wade] would have been impaired to the extent that it was a contributing factor in the crash that caused his death.

(Filing No. 53, at 4-5).

LINA's *Wickman* analysis in the 2011 Denial Letter concluded, "In this claim, we have examined the facts and circumstances surrounding Mr. Loberg's death and have concluded that he put himself in a position in which he should have known that serious injury or death were highly likely to occur" (*Id.* at 5). LINA asserted that

> it cannot be claimed that a reasonable person would be unaware

-9-

>               of the dangers of driving under the
>               influence.  As serious injury or
>               death are highly likely to occur as
>               a result of operating a motor
>               vehicle while legally intoxicated,
>               Wade Loberg's death would not be
>               considered to be accidental in
>               nature as required by this policy.

(*Id.* at 5).

After LINA's second denial of benefits in the 2011 Denial Letter, this Court ordered the parties to file new briefs if they wished to renew their motions for summary judgment.  The parties filed new briefs supporting their motions for summary judgment on January 23, 2012 (Filing Nos. 55 and 57) and filed reply briefs on January 30, 2012 (Filing Nos. 60 and 61).

Because a case out of the District of Minnesota with similar facts was in the appeal process to the United States Court of Appeals for the Eighth Circuit (*McClelland v. Life Ins. Co. of N. Am.*, CIV. 08-4945 MJD/AJB, 2010 WL 3893695 (D. Minn. Sept. 30, 2010)), this Court declined to rule on the newly briefed motions until the appeal was resolved.  The Eighth Circuit issued its decision on May 24, 2012, in *McClelland v. Life Ins. Co. of N. Am.*, 679 F.3d 755 (8th Cir. 2012) and denied petitions for rehearing en banc and for rehearing by the panel on July 16, 2012.

**II.  Applicable Law.**

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving

-10-

party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 321-23 (1986). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.,* 371 F.3d 394, 396 (8th Cir. 2004).

"When an ERISA plan grants the administrator 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' courts review the administrator's benefit decisions for an abuse of that discretion." *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). The Policy appoints LINA as the plan fiduciary for reviewing claims for benefits and grants LINA discretionary authority to interpret the Policy and make benefits determinations. *See* Memorandum & Order, Filing No. 29, at 4. Therefore, the Court will apply an abuse of discretion standard of review.

**A.   The *Wickman* Standard.** In *Wickman*, the United States Court of Appeals for the First Circuit was tasked with analyzing, as a matter of first impression, the definition of the term "accident" under an ERISA-governed accidental death and dismemberment insurance policy. *Wickman*, 908 F.2d at 1079.  The dispute in *Wickman* arose after the decedent fell from a forty to fifty foot bridge and died from the injuries he sustained.  *Id.* at 1080.  The defendant insurance company denied accidental death benefits to the policy beneficiary because the insurance company did not believe the decedent's death resulted from an "accident" under the policy.[1]  *Id.* at 1081.  On appeal, the First Circuit determined the decedent's death was not an accident.  *Id.* at 1089.

In determining what constitutes an "accident," the First Circuit created a three-part, subjective-objective test. *Id.* at 1088.  First, "the reasonable expectations of the insured when the policy was purchased is the proper starting point for a determination of whether an injury was accidental under its terms."  *Id.*  Second, "[i]f the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the

---

[1] The insurance company also denied benefits under the policy's suicide exclusion.  *Id.* at 1081.

suppositions which underlay that expectation were reasonable." *Id.*

> Finally, if the fact-finder, in attempting to ascertain the insured's actual expectation, finds the evidence insufficient to accurately determine the insured's subjective expectation, the fact-finder should then engage in an objective analysis of the insured's expectations. . . . In this analysis, one must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct.

*Id.* (citing *City of Carter Lake v. Aetna Cas. & Surety Co.*, 604 F.2d 1052, 1058-59 & n.4 (8th Cir. 1979)) (internal citation omitted). The *Wickman* standard has become a cornerstone for cases interpreting whether alcohol-related automobile crashes constitute accidents. *See Stamp v. Metro. Life Ins. Co.*, 531 F.3d 84, 89-90 (1st Cir. 2008) (collecting cases utilizing *Wickman* in cases involving alcohol-related injuries and deaths); *see also LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789 (10th Cir. 2010).

      **B.   The *Wickman* Standard as Interpreted by *McClelland*.**
Anthony McClelland ("Anthony") had insurance coverage for accidental death benefits through an ERISA qualified employee

benefit plan. *McClelland*, 679 F.3d at 757. Anthony perished in a motorcycle accident:

> Witnesses indicated that he seemed to be playing "follow the leader" with another motorcycle and possibly a Saturn vehicle by weaving in and out of traffic for approximately six miles. At the time of the accident, Anthony was not wearing a helmet, and witnesses estimated the speed of the weaving vehicles to be, at times, around 90 miles per hour. Witnesses noted that there was a curve in the road where the accident occurred, and that there was a "soft" or gravel shoulder at the curve. One of the eyewitnesses to the accident opined that Anthony simply "couldn't make the curve." The same witness noted that the driver of the Saturn also nearly lost control at the same curve. Toxicology reports indicated that Anthony's blood alcohol content ("BAC") was over .20.

*Id.* at 758. Dawn McClelland, Anthony's wife, submitted a claim for accidental death benefits, but "LINA denied benefits, based upon its position that Anthony's death was not a 'covered accident' because it was foreseeable due to his intoxicated state at the time of the crash." *Id.*

"Following the parties' cross-motions for summary judgment, the district court remanded the matter to the insurer for further proceedings, finding that LINA had employed an unreasonable definition of the term 'accident' in denying coverage." *Id.* As in this case,

> [t]he court ordered LINA to determine on remand whether Anthony's death resulted from an "accident" as defined by [*Wickman*]. Upon remand, both parties submitted expert reports, and Dawn submitted affidavits regarding Anthony's behavior on the morning in question. Following consideration of these materials, and heavily relying upon the report of its expert, Dr. Berman, LINA again decided Anthony's death was not a covered accident. Dawn again appealed this determination to the district court. Upon cross-motions for summary judgment, the district court ruled in favor of Dawn, finding that LINA abused its discretion by applying an unreasonable interpretation of the term "accident" as defined by *Wickman*. The court found that LINA did not reasonably analyze Anthony's subjective expectations on the morning of the accident.

*Id.* at 758-59 (internal citation omitted).

In analyzing LINA's assessment of the *Wickman* standard, the Eighth Circuit stated,

> To properly apply the *Wickman* test, LINA should have taken into account Anthony's characteristics on the day of the accident, rather than relying solely upon its expert's rather categorical conclusion that those who drink and drive should reasonably expect to be killed. On October 27 in particular, Anthony had plans to complete yard work in the afternoon and the uncontroverted evidence was that he showed no obvious signs of intoxication in the hours leading up to his accident. Based on the

>evidence before LINA, Anthony's behavior on the morning of October 27 was normal while visiting with several people, including a sheriff, and he had no problems with balance or orientation. He was in a good mood and joked with the people that he had visited. The objective evidence that Anthony was traveling at a high rate of speed with an elevated blood alcohol level does not alter this subjective evidence. . . . There was overwhelming evidence that subjectively, Anthony, an experienced motorcyclist, intended to ride his Harley to visit friends and then return safely home to do yard work. There was not even a scintilla of evidence that Anthony thought his death was highly likely to occur.

*Id.* at 760-61. The Eighth Circuit cited the deficiencies in LINA's *Wickman* analysis, stating,

>LINA used Dr. Berman's report to decide what Anthony's expectations must have been on the day of the accident. This amounted to a faulty objective evaluation of the evidence, ignoring the subjective components of the *Wickman* test that directs LINA to first determine the expectations of the insured, based upon the insured's personal characteristics and experiences. Only when the evidence is insufficient to accurately determine the insured's subjective expectations at the time of the accident should the objective analysis be so heavily relied upon. Here, subjective evidence was readily available, and all of the subjective facts, and even some of the objective ones, point to the

-16-

> fact that Anthony reasonably did not think it highly likely that he would die on October 27, 2007 . . . . LINA distances itself from the idea that someone who regularly, or at least in the past, has driven after drinking would subjectively believe that death is highly *unlikely* to occur in this situation.

*McClelland*, 679 F.3d at 761 (citing *Wickman*, 908 F.2d at 1088).

The Eighth Circuit concluded,

> In the final analysis, . . . we cannot escape the conclusion that Anthony's fatal motorcycle accident was just that, an accident. Because there were no applicable policy exclusions, *see River v. Edward D. Jones Co.*, 646 F.3d 1029, 1031 (8th Cir. 2011) (for an example of an ERISA qualified plan which wrote an intoxication exception into its plan), it was covered within the meaning of LINA's policy. Though we acknowledge that our review is deferential, we find that LINA committed an abuse of discretion in denying benefits because its interpretation is contrary to the language of the plan that it will cover "loss of life" based upon an "accident" and because substantial evidence does not support its decision.

*McClelland*, 679 F.3d at 761-62.

### III. Discussion.

As with *McClelland*, the Court takes into account Wade's characteristics on the date of the accident. On that evening, Wade had plans to help his friend by driving the friend's truck

-17-

into town.  There is no evidence that Wade intended to crash his friend's truck or injure himself, much less to die.  The evidence suggests, instead, that Wade intended to ride back to his home with Dexter after Wade delivered the truck to town.  According to the affidavits of his friends, Wade showed no obvious signs of intoxication in the hours leading up to his accident, and his behavior was normal while interacting with many people.  There was not a "scintilla of evidence" that Wade thought he was going to die.

As with McClelland, the Court finds that LINA neglected the subjective part of the *Wickman* test in favor of both the opinions of its expert, Dr. Fochtman, and also LINA's own objective conclusion that any reasonable person would expect serious injury or death under the circumstances.  On the contrary, this Court "cannot escape the conclusion" that Wade's fatal truck accident "was just that, an accident," and that it was covered within the meaning of the Policy.  Accordingly, the Court will enter summary judgment in favor of the Lobergs and will deny summary judgment to LINA, in so far as LINA's denial of coverage was an abuse of discretion.

The Lobergs also request a hearing regarding attorney fees and prejudgment interest.  The Court will consider these topics upon appropriate motion.

A separate order will be entered in accordance with this memorandum opinion.

DATED this 14th day of August, 2012.

BY THE COURT:

/s/ Lyle E. Strom
_____
LYLE E. STROM, Senior Judge
United States District Court